PEOPLE *v.* JOHNS

1. GRAND JURY—FAILURE TO ANSWER QUESTIONS—CRIMINAL CON-
TEMPT—CIVIL CONTEMPT.

> Failure to answer questions of a grand juror when ordered to
> do so may be dealt with either criminally or civilly.

2. CONTEMPT—GRAND JURY—SENTENCE.

> A sentence for contempt of a grand juror may be reflective of
> what was sought to be accomplished through the exercise of
> the contempt power.

3. CONTEMPT—SENTENCE—GRAND JURY—CONSTITUTIONAL LAW.

> The time of sentencing for contempt of a grand juror was far
> too late in the criminal process and the context of such pro-
> ceedings was far too ambiguous to adequately inform the
> defendant of the nature of the charge against him and afford
> him that fundamental fairness of process guaranteed by both
> the Michigan and United States Constitutions where the con-
> tempt proceedings were instituted by an order of another
> judge of that circuit directing defendant to show cause why
> he should not be held in contempt for refusal to answer the
> grand juror's questions, placed on the civil docket and heard
> the last day the grand juror sat.

4. CONTEMPT—CRIMINAL LAW—CONSTITUTIONAL LAW—DUE PROCESS.

> Criminal contempt is a crime in the ordinary sense and as such,
> if the prosecutor elected to proceed against the defendant for
> criminal contempt, due process required that the prosecutor
> conduct those proceedings in line with the standard of due
> process familiar to all criminal proceedings.

REFERENCES FOR POINTS IN HEADNOTES

[1] 17 Am Jur 2d, Contempt §§ 30, 76.
[2] 17 Am Jur 2d, Contempt § 104 *et seq.*
[3] 17 Am Jur 2d, Contempt § 80.
[4] 17 Am Jur 2d, Contempt §§ 4, 78.
[5, 6] 17 Am Jur 2d, Contempt § 77 *et seq.*

5. CONTEMPT—CRIMINAL CONTEMPT—CIVIL CONTEMPT—GRAND JURY.
    Defendant could not have been found guilty of criminal contempt and his sentence for such must be vacated and, since the opportunity for punishment for civil contempt expired with the grand jury, defendant must be discharged where the hearing was instituted by a show cause order why defendant should not be held in contempt for refusal to answer a grand juror's questions and heard the last day the grand juror sat when the proceedings lacked any semblance of a criminal trial, the sentence had elements of both civil and criminal contempt and defendant could have reasonably expected that he was indeed being held in civil contempt.

6. CONTEMPT—CRIMINAL CONTEMPT—PROCEDURAL SAFEGUARDS.
    Conviction for criminal contempt can be sustained only upon a record which shows compliance with the procedural safeguards established for the prosecution of any other crime of equal gravity.

Appeal from Court of Appeals, Division 2, McGregor, P. J., and R. B. Burns and Danhof, JJ., affirming Oakland, Farrell E. Roberts, J. Submitted October 8, 1970. (No. 11 October Term 1970, Docket No. 52,574.) Decided February 1, 1971.

18 Mich App 25 reversed.

John Johns was convicted of contempt. Defendant appealed to the Court of Appeals. Affirmed. Defendant appeals. Reversed and defendant discharged.

*Frank J. Kelley*, Attorney General, *Robert A. Derengoski*, Solicitor General, and *Stewart H. Freeman*, Assistant Attorney General, for the people.

*Philip A. Gillis* and *Frank N. MacLean*, for defendant.

T. G. KAVANAGH, J. John Johns refused to answer questions put to him by an Oakland County one man

grand jury, claiming that his answers would tend to incriminate him.[1]　On motion of the Special Assistant Attorney General, the grand juror granted the defendant immunity under MCLA § 767.6 (Stat Ann 1954 Rev § 28.946).　Upon being shown the order granting the defendant immunity, defendant's counsel asked the grand juror whether the immunity was intended to cover any crime or just those crimes within the scope of the grand jury.　The grand juror responded that the immunity was the broadest privilege he could have; that it covered all crimes "inside or outside the scope of the grand jury, or any subject under the sun."　To this, defendant's counsel responded that as stated the immunity order was too broad and was beyond the power of the grand juror to grant.　After consultations between counsel and the defendant, the same questions were again put to the defendant and he refused to answer them, again claiming the Fifth Amendment.

On that day, August 8, 1967, the Assistant Attorney General obtained an order from another judge of that circuit.[2]　The order directed that on August

---

[1] "*Q.* What is your occupation, Mr. Johns?

"*A.* I decline to answer on the grounds that it may tend to incriminate me.

"*Q.* Do you know Roy Clark?

"*A.* I decline to answer the question on the grounds it may tend to incriminate me.

"*Q.* Are you directly or indirectly employed by either of the Giacalones, Vito or Anthony?

"*A.* I decline to answer the questions on the grounds they may tend to incriminate me.

"*Mr. Barry:* May we have a recess, your Honor?

"*The Court:* The Court has a question or two.　Do you know a man by the name of Vito "Billy" Giacalone?

"*A.* I decline to answer the questions on the grounds that they may tend to incriminate me.

"*Mr. Barry:* Your Honor, may I suggest to the Court that in view of the situation that the Court direct and order the witness to answer these questions.

"*The Court:* Mr. John Johns, the Court does order you to answer these questions."

[2] The petition for order to show cause, reads in full as follows:

"Now comes Charles J. Porter, Special Assistant Attorney General,

14, 1967, Johns show cause before the issuing judge, why he should not be held in contempt of court for his refusal to answer the grand juror's questions. The case was placed on the Oakland County Circuit Court civil docket and heard on August 15, 1967—the last day that the grand jury in question would sit.

At the hearing on August 15, 1967, Johns was found to be in contempt of the one man grand jury.

At the hearing the court heard arguments of defense counsel which are represented by the following excerpt:

"*Mr. Koscinski* [*defendant's counsel*]: Well, the only thing I wanted to say, your Honor, please, was that this immunity is as broad as the privilege but the immunity is also limited by the statute. The grand juror cannot go beyond the statute, the limits of the inquiry as provided by statute, as was done here.

---

and moves the Court for An Order requiring JOHN JOHNS to show cause why he should not be adjudged guilty of contempt because of his refusal to answer questions submitted to him in the course of the Judicial Inquiry being conducted by the Honorable James S. Thorburn, Circuit Judge, in the matter of the Petition of Frank J. Kelley, Attorney General for the State of Michigan, Case No. 28539 as set out in the attached Affidavit."

The Affidavit supporting the petition for order to show cause reads in full as follows:

"Charles J. Porter, Special Assistant Attorney General, being first duly sworn says:

"1. That JOHN JOHNS appeared before the Judicial Inquiry being conducted by the Honorable James S. Thorburn on the 8th day of August, 1967, at 11:00 A.M. o'clock, and in response to questions submitted to him refused to answer same on the ground that his answers thereto might incriminate him.

"2. That upon the Petition of Affiant, an Order was signed by the Honorable James S. Thorburn conferring immunity upon the said JOHN JOHNS. A copy of said Order is attached hereto as Exhibit 1.

"3. That having served a copy of the Motion and Order Granting Immunity, and having been asked certain questions as set out in the attached transcript, and having been ordered to answer said questions by the Honorable James S. Thorburn, JOHN JOHNS did refuse to answer said questions on the ground that his answers thereto might tend to incriminate him."

"*The Court:* I would agree with Counsel as to any subsequent action with respect to action taken after testimony was given. This reached that stage, however. I will find the defendant guilty of contempt."

Following this colloquy the judge sentenced the defendant as follows:

"The Court finds the defendant guilty of contempt and will sentence him to one year in the county jail and a fine of a thousand dollars. The one year will be less two days he was serving in temporary custody.

"Today you may purge yourself before Judge Thorburn; if you so desire to do that I will review the sentence."

The next day, August 16, 1967, he revised commitment and added a provision for admission to bail pending appeal. The defendant appealed to the Court of Appeals challenging both the validity of the proceedings and the subsequent sentence. In their answer, the people argued that the contempt proceedings below were criminal in nature and as such, the people claimed that the proceedings and sentence were valid.

The defendant responded that this was the first he had been advised that the proceedings were in any way criminal. In his reply brief he raised two additional issues—first, that the lack of adequate notice of the criminal nature of the proceedings denied him due process of law; and second, that if the proceedings were criminal in nature he was entitled to a jury trial.

The Court of Appeals ruled against the defendant on his initial issues and declined to rule on his reply issues on the ground that they had "not been properly preserved for appellate review."

The defendant now contends that if the contempt proceedings were civil in nature, imprisonment could not extend beyond the life of the grand jury—in this case one day.

He alternatively argues that if the proceedings were criminal in nature he was denied all the Constitutional protections of criminal process including the prosecutor's bearing the burden of proof and the right to a jury trial and further he faced a possible sentence of 365 days in jail.

As a consequence of this situation he maintains that without adequate notice from the prosecutor or court he had to determine, at his peril, the nature of the proceedings. He contends that his strategy, objections and the consequences of his refusal to answer (one day as opposed to 365 days imprisonment) depended upon his choice. He contends that since the nature of the proceedings are of fundamental importance and since his entire approach and its consequences are dependent on the type of proceedings, due process requires that he be informed of the nature of the charge with adequate time to prepare his defense.

In answer to this the prosecutor contends that the defendant faced nothing unusual. He argues:

" * * * in Michigan, any contempt may be criminal if the *sentences* 'were in the nature of punishment for offenses committed, not to enforce the performance of an act.' *Cross Co.* v. *UAW Local No. 155* (1966), 377 Mich 202, 210–211." (Emphasis added.)

The prosecutor concludes that the context of these proceedings, the brief time remaining in the grand jury, and the sentence itself patently revealed to the defendant that the nature of the proceedings was criminal.

We agree with the prosecutor when he argues that the failure to answer questions of a grand juror when ordered to do so *may* be dealt with either criminally or civilly. (See for example *In re Colacasides* [1967], 379 Mich 69, *People* v. *Joseph* [1970], 384 Mich 24, and also the dissenting opinion of Chief Justice Warren in *Brown* v. *United States* [1959], 359 US 41 [79 S Ct 539, 3 L Ed 2d 609].)

We further agree that the sentence may be reflective of what was sought to be accomplished through the exercise of the contempt power. *Shillitani* v. *United States* (1966), 384 US 364 (86 S Ct 1531, 16 L Ed 2d 622).[3]

However we hold that the time of sentencing was far too late in the criminal process and the context of these proceedings was far too ambiguous to adequately inform the defendant of the nature of the charge against him and afford the defendant that fundamental fairness of process guaranteed by both the Michigan and the United States Constitutions.[4]

"We must conclude that plaintiff was convicted and deprived of his liberty without due process of law. The offense with which he was charged was not committed in the presence of the court. *He is therefore entitled to be informed of its nature,* and to be given time to prepare his defense, and secure the assistance of counsel." (Emphasis added.) *In re Smilay* (1926), 235 Mich 151, 156.

In this case the defendant refused to answer the grand juror's questions under a claim of right. He was offered immunity—the immunity of course,

---

[3] It would appear in this case that the sentencing judge wanted it both ways. His "you purge—I'll review" provision coupled with the sentence extending well beyond the grand jury had the best of both forms of contempt punishment. So even the sentence is ambiguous in this case.

[4] "Defendants in contempt proceedings should be given every opportunity to exonerate themselves." *In re White* (1950), 327 Mich 316.

could only extend as far as the scope of the grand jury. By refusing to answer the grand juror's questions after the proffered immunity was declined, the defendant did so either under a claim of right—that the question was beyond the scope of the inquiry— or by exhibiting his contempt of the grand jury and his willingness to accept the consequences. In either event his final decision to purge himself, or to go to jail for however long, or to continue to claim the Fifth Amendment was dependent upon his determination of the consequences of each course of action.

It should be apparent that the context of these proceedings made the nature of these proceedings anything but apparent. If the context of these proceedings are to be treated as having given notice of the criminal nature of the charge against the defendant, then it would do away with the requirement of adequate and clear notice required in all criminal proceedings.

As we said in *People* v. *Joseph, supra,* " 'Criminal contempt is a crime in the ordinary sense  *  *  * .' " *Bloom* v. *Illinois* (1968), 391 US 194 (88 S Ct 1444, 20 L Ed 2d 522). As such, if the prosecutor elected to proceed against the defendant for criminal contempt, due process required that the prosecutor conduct those proceedings in line with the standard of due process familiar to all criminal proceedings.[5]

---

[5] The United States Supreme Court has required the Congress of the United States to clearly set forth the subject matter of a congressional investigation. They held that fundamental fairness required such specificity so that witnesses would not be at their peril in determining the pertinency of proffered committee questions.

In asserting the importance of individual freedoms and procedural fairness, the United States Supreme Court stated in *Watkins* v. *United States* (1957), 354 US 178 (77 S Ct 1173, 1 L Ed 2d 1273 at 215, 216):

"It is only those investigations that are conducted by use of compulsory process that give rise to a need to protect the rights of individuals against illegal encroachment. That protection can be read-

When the hearing was instituted by a show cause order and placed on the civil docket, when the proceedings lacked any semblance of a criminal trial and when the sentence had elements of both civil and criminal contempt the defendant could have reasonably expected that he indeed was being held in civil contempt.

We therefore hold that under the procedure followed here, the defendant could not have been found guilty of criminal contempt and his sentence for such must be vacated.

Likewise since the opportunity for punishment for civil contempt expired with the grand jury, we hold the defendant must be discharged.

In order to obviate the confusion arising from such proceedings[6] we hold that conviction for criminal contempt can be sustained only upon a record which shows compliance with the procedural safeguards established for the prosecution of any other crime of equal gravity.

Reversed. Defendant discharged.

T. M. KAVANAGH, C. J., and ADAMS and T. E. BRENNAN, JJ., concurred with T. G. KAVANAGH, J.

BLACK, J., concurred in the result.

SWAINSON and WILLIAMS, JJ., did not sit in this case.

---

ily achieved through procedures which prevent the separation of power from responsibility and which provide the constitutional requisites of fairness for witnesses. * * * That is a small price to pay if it serves to uphold the principles of limited, constitutional government without constricting the power of the Congress to inform itself."

6 We are not dealing with direct contempts committed in the view and presence of the court which may be dealt with summarily.